UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SHAREEN ISMAIL, M.D., and THE ALEXANDRE CENTRE
FOR CHILDREN'S HEALTH (ISMAIL MEDICINE PLLC),

                              **Plaintiffs,**

                                               Civil Action No.: 5:25-cv-01653

vs.

NEW YORK STATE DEPARTMENT OF HEALTH,
JAMES V. MCDONALD, JOSEPH A. GIOVANNETTI,
JENNIFER PERSON, and JOHN DOES 1-5

                              **Defendants.**
_____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### I.    Preliminary Statement

        This case presents a modern-day "Star Chamber" operating within the New York State Department of Health ("DOH"). In a coordinated campaign to destroy a licensed physician's practice without a hearing, notice, or adjudication, the Defendants have weaponized the internet and administrative access codes to inflict immediate, irreversible punishment on Dr. Shareen Ismail and The Alexandre Centre for Children's Health.

        On September 30, 2025, without a scintilla of due process, Defendants publicly branded Dr. Ismail a criminal. They placed her name on a state-run website titled "School Vaccination Fraud Awareness,"[1] grouping her with providers who have been "permanently excluded" or "banned" from practice. This digital scarlet letter expressly

---

[1] https://www.health.ny.gov/prevention/immunization/schools/fraud.htm (last accessed on November 27, 2025).

directs every school district in New York to reject her medical records, effectively invalidating her medical license in the eyes of the education system.

Simultaneously, Defendants executed the "plus" factor of this unconstitutional "stigma-plus" scheme. They summarily suspended the New York State Immunization Information System ("NYSIIS") access for Dr. Ismail's *entire* clinic—including seven innocent nurses who had no involvement in the allegations. Without NYSIIS, a pediatrician in New York cannot verify histories, report mandatory data, or generate school forms. This suspension was not a regulatory pause; it was a death penalty for the practice, executed before the investigation had even begun.

Defendants achieved this summary punishment by engaging in a calculated statutory bypass. They knowingly invoked general administrative powers under Public Health Law ("PHL") § 206 to conduct a professional misconduct investigation, deliberately circumventing the mandatory due process safeguards of PHL § 230—which guarantees physicians the right to twenty days' written notice, an interview, and strict confidentiality *before* any disciplinary action is taken.

When Plaintiffs' counsel formally objected to this illegality, Defendants did not retreat; they escalated to police-state tactics that shock the conscience:

1. **Witness Intimidation:** DOH Investigator Jennifer Person contacted patients directly, slanderously asking, "Were you aware Dr. Ismail is against vaccines?" and threatening private citizens with unannounced home raids, stating: *"It's not impossible that I would knock on your door."* (Barbara Campbell Declaration at ¶¶ 8, 10).

2. **Home Invasions:** On November 14, 2025, DOH "detectives" bypassed counsel to ambush one of Dr. Ismail's nurses, Maria Petersen, RN, at her private residence for an unannounced interrogation. (Maria Petersen Declaration at ¶¶ 4-6).

3. **Spoliation of Evidence:** Most egregiously, on November 12, 2025—just 48 hours after the Onondaga County Health Department validated and entered immunization records for Dr. Ismail's own son—Defendants maliciously "wiped" those valid government records from the NYSIIS database. (Shareen Ismail Declaration at ¶¶ 16-17; *see also* Davenport Decl., Exhibits I and J). This act of digital sabotage was used to manufacture a pretext to exclude a six-year-old child from school.

The harm here is not merely reputational; it is existential. Dr. Ismail is losing patients daily because she is physically blocked from administering vaccines. Her staff is being terrorized in their homes. Her own child has been barred from class due to evidence tampering by the State. Plaintiffs respectfully request that this Court issue a Temporary Restraining Order to freeze this lawless escalation, restore the status quo, and prevent the Defendants from continuing to destroy a medical practice before a single charge has been proven in a court of law.

## II.    <u>Statement of Facts and Procedural History</u>

Plaintiff Shareen Ismail, M.D. ("Dr. Ismail") is a physician duly licensed to practice medicine in the State of New York and the owner of The Alexandre Centre for Children's Health ("The Centre"), a pediatric practice located in Fayetteville, New York (Davenport Decl., Ex. A at ¶ 1). Prior to the events described herein, Dr. Ismail maintained

an unblemished record with all relevant licensing bodies and served hundreds of families in the Central New York region (Davenport Decl., Ex. A at ¶¶ 3-4).

On September 30, 2025, without prior notice, a hearing, or any finding of wrongdoing, Defendants initiated a coordinated punitive campaign against Plaintiffs. Defendants publicly listed Dr. Ismail and The Centre on a New York State Department of Health ("DOH") website titled "School Vaccination Fraud Awareness," explicitly grouping her with providers who have been "permanently excluded" or "banned" from practice (Davenport Decl., Ex. D). This website contains a directive to all school districts to reject Dr. Ismail's medical records, stating: "Paper-only records of vaccinations administered after this date from this provider must not be accepted" (Davenport Decl., Ex. D at 2). Simultaneously, Defendant Joseph Giovannetti, Director of the Bureau of Investigations, summarily suspended the New York State Immunization Information System ("NYSIIS") access for Dr. Ismail and the entire clinic, including seven nurses who were not targets of the investigation (*See* Davenport Decl., Ex. F). In an email dated October 1, 2025, Defendant Giovannetti confirmed this suspension was "effective immediately" and admitted it was based on an "investigation to date" rather than a final adjudication (Davenport Decl., Ex. F).

To execute these measures, Defendants issued a subpoena on September 30, 2025, citing the Commissioner's general administrative powers under Public Health Law ("PHL") § 206 rather than the specific statutory scheme for physician discipline under PHL § 230 (Davenport Decl., Ex. E). This subpoena demanded the production of complete medical charts for 51 unrelated patients, bypassing the mandatory due process safeguards—such as the twenty-day notice letter and the opportunity for an interview—guaranteed by PHL § 230 (Davenport Decl., Ex. E at ¶ 2; Davenport Decl., Ex. G at 2). On

October 20, 2025, Plaintiffs' counsel formally objected to the subpoena as legally defective and demanded the restoration of Dr. Ismail's rights (Davenport Decl., Ex. G). Defendants refused to cure these violations; on October 27, 2025, Defendant Giovannetti stated the Department would "not withdraw its lawful subpoena" nor remove Dr. Ismail from the "Fraud" website (Davenport Decl., Ex. H). Plaintiffs subsequently served a Notice of Intention to File Claim upon the Attorney General on October 23, 2025 (Davenport Decl., Ex. L).

During this unlawful investigation, Defendants escalated their tactics to witness intimidation. On October 8, 2025, DOH Investigator Jennifer Person telephoned Barbara Campbell, a patient of The Centre (Davenport Decl., Ex. B at ¶ 5). As captured on video recording, Investigator Person slandered Dr. Ismail by asking, "Were you aware Dr. Ismail is against vaccines?" and declared the practice's work "null and void" (Davenport Decl., Ex. B at ¶¶ 8-9; Davenport Decl., Ex. K). Investigator Person further threatened the patient with a government home visit, stating, "It's not impossible that I would knock on your door" (Davenport Decl., Ex. B at ¶ 10). This threat was realized against Plaintiffs' staff on November 14, 2025, when DOH "detectives" conducted an unannounced interrogation at the private residence of Maria Petersen, RN, deliberately bypassing counsel to question a subordinate employee at her home (Davenport Decl., Ex. C at ¶¶ 4-6).

Most egregiously, Defendants engaged in the spoliation of government records to manufacture a pretext for excluding Dr. Ismail's own son from school. On November 10, 2025, Brittany Checksfield, RN, of the Onondaga County Health Department, reviewed and uploaded the immunization records for Dr. Ismail's son into NYSIIS, confirming in writing: "I put all of [the child's] vaccines into the [NYSIIS]. He is

up to date" (Davenport Decl., Ex. I). A contemporaneous photograph of the NYSIIS screen confirms the records were present (Davenport Decl., Ex. J at 1). However, less than 48 hours later, on November 12, 2025, these validated records were wiped from the system, resulting in the child's exclusion from school (Davenport Decl., Ex. A at ¶¶ 16-17; Davenport Decl., Ex. J at 2). The current NYSIIS report for the child now falsely reads: "This patient has no immunizations associated with it" (Davenport Decl., Ex. J at 2).

### III.    <u>Argument</u>

#### A.    *Plaintiffs Will Suffer Immediate and Irreparable Harm Absent a Temporary Restraining Order*

To obtain a Temporary Restraining Order, the movant must demonstrate: (1) a likelihood of success on the merits; (2) irreparable harm in the absence of preliminary relief; and (3) that the balance of equities tips in the movant's favor. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Second Circuit has consistently held that "irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotations and citations omitted). Here, Plaintiffs meet this burden through three distinct but compounding avenues: the active deprivation of constitutional rights, the imminent destruction of a business enterprise, and permanent reputational ruin.

First, it is black-letter law that the deprivation of constitutional rights constitutes irreparable harm *per se*. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). This presumption of irreparable harm extends to Due Process

violations where, as here, the plaintiff faces a continuing deprivation of a liberty or property interest. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Defendants' maintenance of the "School Vaccination Fraud Awareness" website—which publicly brands Dr. Ismail a criminal without a hearing—coupled with the summary suspension of her NYSIIS access, constitutes an ongoing "stigma-plus" violation of the Fourteenth Amendment. Every minute the website remains active, Dr. Ismail's constitutional rights are being actively violated.

Second, Plaintiffs face the imminent destruction of their business, a harm that money damages cannot retroactively cure. In the Second Circuit, the loss of trade, loss of goodwill, and the loss of a business enterprise constitute irreparable harm because such losses are difficult to quantify and often fatal to the business's survival. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37-39 (2d Cir. 1995); *see also Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (finding irreparable harm where the "right to continue a business . . . is not measurable entirely in monetary terms").

Here, the summary suspension of NYSIIS access has functionally paralyzed The Alexandre Centre. Without NYSIIS, Dr. Ismail cannot verify vaccination histories, report immunizations as mandated by Public Health Law § 2168, or generate the forms required for patients to attend school. (Shareen Declaration at ¶¶ 8-9). Dr. Ismail is currently forced to tell frantic parents that she is unable to administer vaccinations, causing them to flee the practice to avoid school exclusion. Furthermore, Dr. Ismail cannot perform standard billing functions without NYSIIS access. Where a defendant's

actions threaten to obliterate the plaintiff's business, injunctive relief is necessary to preserve the status quo. *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984). If this Court waits for a final trial, there will be no medical practice left to save.

Third, the harm to Dr. Ismail's professional reputation is catastrophic and irreversible. Defendants have listed Plaintiffs on a public registry explicitly titled "School Vaccination Fraud Awareness," grouping Dr. Ismail with providers who have been "permanently excluded" or "banned." (*See* Davenport Decl., Exhibit D). In the medical profession, where trust is paramount, such a label is a bell that cannot be unrung. Courts recognize that damage to a business's reputation and goodwill is a classic form of irreparable harm because it is difficult to establish the monetary value of such damage. *See Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 109 (2d Cir. 1986); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) (finding a decline in a union's membership, loss of employee benefits, and ongoing erosion of the employer-union relationship sufficient to establish irreparable harm). Defendants are not merely damaging Dr. Ismail's reputation; they are aggressively dismantling it. DOH Investigator Person was recorded telling a patient that Dr. Ismail's work is "null and void" and ordering the patient to "go back to the original pediatrician." (Barbara Campbell Declaration at ¶ 9). This active poisoning of the marketplace creates a permanent stain on Plaintiffs' professional standing that no future damages award can erase.

Finally, the Defendants' "conscience-shocking" conduct—including the spoliation of government records that resulted in the exclusion of a six-year-old child from school and the ambush of nurses at their private homes—demonstrates a malicious intent to alter the status quo through extra-legal means. A TRO is necessary not only to

8

prevent economic ruin but to protect the Plaintiffs and their staff from further harassment and to prevent the further destruction of evidence while this Court adjudicates the grave constitutional issues at hand.

### B. *Plaintiffs Are Likely to Succeed on the Merits of Their Constitutional Claims*

To obtain a preliminary injunction, a plaintiff need only show that "serious questions going to the merits were raised and the balance of hardships tips decidedly in [the plaintiff's] favor," or a "likelihood of success on the merits." *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

Here, Plaintiffs demonstrate not just a likelihood, but an overwhelming probability of success. The record establishes that Defendants executed a "statutory bypass" to strip Dr. Ismail of her due process rights, engaged in "stigma-plus" defamation, and committed acts of spoliation that shock the conscience.

### 1. <u>Plaintiffs Will Succeed on the Procedural Due Process ("Stigma-Plus") Claim</u>

The Fourteenth Amendment protects against the deprivation of liberty or property without due process of law. To prevail on a "stigma-plus" claim, a plaintiff must show: (1) the government made stigmatizing statements that call into question the plaintiff's "good name, reputation, honor, or integrity"; (2) the statements were made public; and (3) the stigmatizing statements were made concurrently with the loss of a tangible interest ("the plus"). *Segal v. City of New York*, 459 F.3d 207, 209 n.1, 212 (2d Cir. 2006); *Paul v. Davis*, 424 U.S. 693, 708 (1976) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice, and an opportunity to be heard are essential.")

1. **The Stigma: Government Defamation** The "stigma" requirement is met where the state makes statements that are false and damaging. *Valmonte v. Bane*, 18 F.3d 992, 1000 (2d Cir. 1994). Here, Defendants publicly branded Dr. Ismail a "fraud." On September 30, 2025, DOH published Plaintiffs' names on a website titled "School Vaccination Fraud Awareness." This website explicitly groups Dr. Ismail with physicians who have been "permanently excluded" or "banned." (Davenport Decl., Exhibit D). This is not a statement of opinion; it is a statement of fact accusing the Plaintiff of criminal conduct. Furthermore, Defendants' agents orally slandered Dr. Ismail to patients, asking, *"Were you aware Dr. Ismail is against vaccines?"* (Barbara Campbell at ¶ 8)—a verifiable lie regarding a physician who runs a vaccination clinic. These statements strike at the heart of Dr. Ismail's professional integrity.

2. **The Plus: Extinguishment of the Right to Practice** The "plus" factor requires the loss of a tangible interest. *Patterson v. City of Utica*, 370 F.3d 322, 330 (2d Cir. 2004). By summarily suspending NYSIIS access for the entire clinic, Defendants revoked a state-mandated property interest essential for practicing pediatrics in New York. Under New York Public Health Law § 2168, reporting to NYSIIS is mandatory. By blocking access, the State has legally disabled the practice (Shareen Ismail Declaration at ¶¶ 8-9). Courts have long held that the loss of government privileges essential to a business constitutes a sufficient "plus" factor. *See Greenwood v. New York*, 163 F.3d 119, 124 (2d Cir. 1998) (clinical privileges). Furthermore, the DOH website contains a specific directive to schools: *"Paper-only records . . . from this provider must not be*

*accepted.*" (Davenport Decl., Exhibit D). This is a state-imposed barrier to trade that effectively invalidates Dr. Ismail's medical license in the education sector.

3.  **The Lack of Process: The "Statutory Bypass"** Crucially, this deprivation occurred without *any* pre-deprivation process. Defendants deliberately utilized a legal trick: they cited the Commissioner's general administrative powers under Public Health Law ("PHL") § 206 to conduct a professional misconduct investigation (*See* Davenport Decl., Exhibit E). By doing so, they intentionally bypassed the mandatory safeguards of PHL § 230, the exclusive statute governing physician discipline.

    - **No Notice:** PHL § 230(10)(a)(iii) entitles a physician to twenty days' written notice detailing the conduct under investigation. Dr. Ismail received none.

    - **No Interview:** PHL § 230(10)(a)(iii) makes an "opportunity to be interviewed" a "condition precedent" to convening an investigation committee. Defendants ignored this, moving directly to punishment.

    - **No Confidentiality:** PHL § 230(10)(a)(v) mandates that investigatory files "shall be confidential." Defendants violated this by publishing the "Fraud" website before any charges were proven.

    This *ultra vires* evasion of statutory due process renders the Defendants' actions unconstitutional *ab initio*.

2.  <u>**Plaintiffs Will Succeed on the Substantive Due Process Claim**</u>

    The Substantive Due Process Clause of the Fourteenth Amendment protects citizens against government action that is "arbitrary, conscience-shocking, or oppressive

in a constitutional sense," regardless of the fairness of the procedures used to implement it. *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995). To succeed, a plaintiff must demonstrate that the government's conduct was so egregious, so outrageous, that it may fairly be said to violate the "decencies of civilized conduct." *Rochin v. California*, 342 U.S. 165, 173 (1952). While this is a rigorous standard, the Defendants' conduct in this case—specifically the malicious spoliation of government records and the deployment of "police-state" intimidation tactics—easily surmounts this high bar.

Here, the most flagrant violation of substantive due process is the Defendants' manipulation of the NYSIIS database to manufacture a violation against Dr. Ismail's own family. The record establishes a timeline of "orchestrated entrapment" that serves no legitimate government interest and is designed solely to injure:

- On November 10, 2025, Brittany Checksfield, RN, of the Onondaga County Health Department, reviewed the immunization records of Dr. Ismail's son, John Doe. Nurse Checksfield confirmed in writing: "I put all of [John Doe's] vaccines into the New York State Immunization Information System. He is up to date with current NY school requirements." (Davenport Decl., Exhibit I). Independent verification by school nurse Renee Fuller on the same day confirmed the records were present and valid. (Davenport Decl., Exhibit J at 1).

- Less than 48 hours later, these valid government records apparently were wiped from the system via a targeted bulk delete. (*Id.* at 2).

- Defendants then used this deletion to justify the immediate removal of the child from school (Shareen Ismail Declaration at ¶¶ 16-17).

For the State to demand proof of compliance in a specific database, validate that proof, and then maliciously delete it to create a pretext for punishment constitutes

the definition of arbitrary and oppressive conduct. It creates a Kafkaesque trap where compliance is impossible because the State destroys the evidence of compliance the moment it is submitted. Such conduct is "unjustifiable by any government interest" and constitutes an abuse of power that shocks the judicial conscience. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Defendants further violated substantive due process by abandoning legitimate investigative tools in favor of intimidation tactics that intrude upon the sanctity of private life.

- **Home Invasions:** On November 14, 2025, DOH agents traveled to the private residence of Maria Petersen, RN, an employee of the Plaintiffs. (*See* Renee Declaration at ¶¶ 2-4). Despite knowing the practice was represented by counsel, these agents ambushed Ms. Petersen at her doorstep for an unannounced interrogation. (*Id*. at ¶ 8). Ms. Petersen describes the encounter as feeling "less like a routine administrative inquiry and more like a police raid," leaving her fearful for her safety. (*Id*. at ¶ 7).

- **Terrorizing Patients:** DOH Investigator Person threatened a patient, Barbara Campbell, with a government raid on her private home, stating: *"We're in and out of the Syracuse area. It's not impossible that I would knock on your door."* (Barbara Campbell at ¶ 10). Using the threat of state force to terrorize a mother in her own home simply because she chose a specific pediatrician is an abuse of power that violates fundamental standards of decency.

Finally, Defendants engaged in arbitrary collective punishment by suspending the NYSIIS access of the *entire* Alexandre Centre staff. By punishing seven innocent nurses and administrative staff members—who are not targets of the

investigation—for the alleged conduct of Dr. Ismail, Defendants exercised state power in a manner that is "arbitrary in the constitutional sense." *Collins v. City of Harker Heights*, 503 U.S. 115, 128-129 (1992).

Taken together, these actions reveal a government apparatus that has gone rogue, operating outside the bounds of law to crush a perceived enemy. This is precisely the type of oppressive executive action the Substantive Due Process Clause was designed to prevent.

### 3.   Plaintiffs Will Succeed on the First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim under 42 U.S.C. § 1983, a plaintiff must demonstrate: (1) she engaged in speech or conduct protected by the First Amendment; (2) the defendant took adverse action against her; and (3) there was a causal connection between the protected activity and the adverse action. *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Here, the record establishes a clear pattern of escalation by the Defendants directly following the Plaintiffs' assertion of their constitutional rights.

Plaintiffs engaged in quintessential First Amendment activity by petitioning the government for redress of grievances. Specifically, on October 20, 2025, Plaintiffs' counsel formally objected to the Defendants' defective subpoena, citing specific statutory violations and demanding the restoration of Dr. Ismail's due process rights. (*See* Davenport Decl., Exhibit G). Furthermore, on October 23, 2025, Plaintiffs served a verified Notice of Intention to File Claim upon the Attorney General, officially signaling the commencement of litigation against the State. (*See* Davenport Decl., Exhibit L). The First Amendment protects not only the right to speak, but the right to retain counsel and

14

petition the government to cease unlawful conduct. *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387-389 (2011).

In the Second Circuit, an adverse action is one that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644-645 (2d Cir. 2011). Defendants' conduct post-dating the Plaintiffs' legal objections easily satisfies this standard.

After Plaintiffs asserted their rights on October 20, Defendants did not retreat; they weaponized their authority. They escalated from administrative suspension to "police-state" tactics designed to terrorize the Plaintiffs into silence:

- **Targeting the Plaintiff's Child:** On November 12, 2025, Defendants engaged in the spoliation of government records by "wiping" the valid immunization history of Dr. Ismail's six-year-old son from the NYSIIS database. (*See* Davenport Decl., Exhibit J at 2). Targeting a physician's own child for exclusion from school is a retaliatory act so severe it would chill the speech of any person of ordinary firmness.

- **Home Invasions:** On November 14, 2025, Defendants dispatched "detectives" to the private home of Nurse Maria Petersen for an unannounced, warrantless interrogation. (*See* Maria Petersen Declaration at ¶¶ 6-7). Ambushing staff at their homes is a classic intimidation tactic designed to sever the loyalty of employees and isolate the Plaintiff.

A plaintiff can establish a causal connection through "temporal proximity" between the protected speech and the adverse action. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). The timeline here creates an irrefutable inference of retaliation:

- **October 20:** Plaintiffs formally object to the subpoena.

- **October 27:** Defendant Giovannetti refuses to withdraw the "Fraud" listing, doubling down on the stigma.

- **November 12:** Defendants wipe the NYSIIS records of Dr. Ismail's son.

- **November 14:** Defendants raid the home of Nurse Petersen.

This tight temporal proximity coupled with the absence of any legitimate government interest in deleting valid records or ambushing nurses at home, demonstrates that the Defendants' actions were motivated by a desire to punish Dr. Ismail for daring to challenge their authority.

### 4.    Plaintiffs Will Succeed on the Fourth Amendment Claim

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to civil and administrative proceedings, not just criminal investigations. *Soldal v. Cook Cnty.*, 506 U.S. 56, 67 (1992). The Defendants' conduct in this matter—specifically the warrantless destruction of digital property and the intrusion into the private homes of employees—constitutes a flagrant violation of these core constitutional protections.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). This protection applies to business records and digital data. *See United States v. Ganias*, 755 F.3d 125, 137 (2d Cir. 2014) (recognizing Fourth Amendment interests in computer files).

Here, Plaintiffs possess a constitutionally protected property and business interest in the immunization records they create, maintain, and submit to the state

registry pursuant to Public Health Law § 2168. On November 12, 2025, Defendants executed a bulk delete or wiping of the valid immunization history of Dr. Ismail's son from the NYSIIS database. This deletion was not a clerical error; it was a deliberate, warrantless destruction of data that had been validated by government officials just 48 hours prior.

By deleting these records, Defendants engaged in a "meaningful interference"—indeed, a total destruction—of Plaintiffs' possessory interest in that data. This seizure was executed:

- **Without a Warrant:** Defendants sought no judicial authorization to seize or destroy these specific records.

- **Without Probable Cause:** The records were validated by the Onondaga County Health Department on November 10, establishing their legitimacy.

- **Without Pre-Deprivation Process:** The "wipe" occurred summarily, stripping Plaintiffs of the evidence necessary to prove compliance with school enrollment laws.

The Supreme Court has held that the government cannot seize property to manufacture a violation or purely for the sake of harassment. *See Soldal*, 506 U.S. at 71 (holding that the Fourth Amendment protects against unreasonable seizures of property even where no search for evidence occurs).

The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 586 (1980). While the government has broader latitude to conduct administrative inspections of *closely regulated businesses*, this authority does not extend to the private residences of employees. *See Camara v. Mun. Court*, 387 U.S. 523, 534 (1967) (holding that administrative searches of private residences generally require a warrant).

17

On November 14, 2025, Defendants violated this sanctity of the home by dispatching "detectives" to the private residence of Maria Petersen, RN, an employee of The Centre:

- **No Nexus to Business Premises:** Ms. Petersen was at her private home, off-duty. Her home is not a "regulated business" subject to warrantless inspection under *New York v. Burger*, 482 U.S. 691, 701-702 (1987).

- **No Warrant:** The agents did not present a warrant.

- **Coercion:** The agents conducted an unannounced interrogation on her doorstep, which Ms. Petersen described as feeling "like a police raid" designed to bypass counsel. (Maria Petersen Declaration at ¶ 8).

Furthermore, Defendants threatened to expand these warrantless searches to patients. Investigator Person explicitly told a patient, Barbara Campbell, *"It's not impossible that I would knock on your door*." (Barbara Campbell Declaration at ¶ 10). Using the threat of warrantless home entry to coerce information from private citizens is objectively unreasonable and violates the core tenet that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

Finally, the Defendants cannot hide behind the shield of an "administrative investigation." The Supreme Court has made clear that the government may not use an administrative inspection scheme as a pretext to search for evidence of criminal conduct. *New York v. Burger*, 482 U.S. 691, 724 (1987) ("In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal investigations.")

Here, the Defendants publicly labeled the Plaintiffs as engaging in "Fraud"—a criminal offense—on their website. (*See* Davenport Decl., Exhibit D). Having identified the investigation as a hunt for criminal "fraud," Defendants were required to obtain warrants based on probable cause. Instead, they utilized their administrative access to "wipe" databases and visit homes without judicial oversight. This use of administrative power as a pretext for a punitive raid renders the searches and seizures unconstitutional.

**C.    *The Balance of Equities and the Public Interest Weigh Heavily in Favor of Granting the Injunction***

The final two factors in the preliminary injunction analysis—the balance of equities and the public interest—merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To defeat the motion, the government must show that the harm to the public interest if the injunction is granted outweighs the harm to the plaintiff if it is denied. *Id.*

Here, the balance tips overwhelmingly in favor of the Plaintiffs. Granting the requested relief will merely restore the status quo and compel the Defendants to follow the law, whereas denying it will result in the total destruction of a medical practice and the continued violation of fundamental constitutional rights.

**1.    <u>The Balance of Hardships Tips Decidedly in Plaintiffs' Favor</u>**

On one side of the scale is the existential destruction of the Plaintiffs' livelihood and reputation. As detailed *supra*, the Defendants' "Fraud" listing and summary suspension of NYSIIS access have functionally paralyzed The Alexandre Centre. Dr. Ismail is currently unable to administer vaccinations, billing is impossible, and

patients are fleeing the practice daily due to the State-imposed stigma. (Shareen Ismail Declaration at ¶¶ 8-9). Without immediate judicial intervention, The Centre will likely be forced to close its doors permanently before a trial on the merits can be held. The Second Circuit has recognized that where a defendant's conduct threatens to destroy a business, the balance of equities favors the plaintiff. *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2d Cir. 1984); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970).

On the other side of the scale, the Defendants suffer absolutely no cognizable harm if the injunction is granted.

- **No Risk to Public Safety:** Dr. Ismail is a licensed physician in good standing with the Office of Professional Medical Conduct. Restoring her NYSIIS access simply allows her to document the vaccinations she administers—an activity the State mandates under Public Health Law § 2168.

- **Available Legal Avenues:** The State is not stripped of its power to discipline Dr. Ismail. If the DOH genuinely believes she has committed misconduct, they have a statutory mechanism to address it: Public Health Law § 230. They can issue a proper notice, convene a committee, and afford her a hearing. The only "hardship" the Defendants will suffer is the inconvenience of being forced to comply with the Due Process Clause and their own statutes.

### 2.    <u>The Injunction Serves the Public Interest</u>

The public interest is best served by granting the TRO for three distinct reasons. First, it is axiomatic that "securing First Amendment rights is in the public interest." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (internal

quotations and citations omitted). Similarly, the public interest is never served by the violation of constitutional due process. Here, the public has a profound interest in ensuring that state agencies do not utilize "police-state" tactics—such as ambushing nurses at their homes or deleting government records—to punish citizens without trial.

Second, the Defendants' actions have disrupted the medical care of hundreds of children in Central New York. By effectively shuttering The Centre's vaccination capabilities, the State has forced parents to scramble for appointments elsewhere or leave their children unvaccinated and excluded from school. (Shareen Ismail Declaration at ¶ 18). The public interest in public health is best served by keeping a pediatric clinic open and functional, ensuring that patients have access to their medical home and their trusted physician.

Third, the public has a paramount interest in the integrity of government databases. The evidence shows that Defendants or their agents engaged in the spoliation of evidence by "wiping" valid immunization records from NYSIIS to create a pretext for exclusion. It is manifestly contrary to the public interest to allow a government agency to manipulate public records to win an administrative dispute. Granting the injunction and ordering the restoration of the deleted records protects the integrity of the NYSIIS system itself.

## IV.    <u>Conclusion</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court intervene immediately to halt a rogue administrative campaign that has unmoored itself from the constraints of due process and basic decency. Plaintiffs respectfully request that

this Court grant the Temporary Restraining Order and Preliminary Injunction requested by Plaintiffs, directing Defendants to:

1. Immediately remove Plaintiffs' names from the "School Vaccination Fraud Awareness" website and any similar public listings;

2. Immediately restore full NYSIIS access for Dr. Shareen Ismail, The Alexandre Centre for Children's Health, and all employed staff;

3. Immediately restore the "wiped" immunization records of Dr. Ismail's son (John Doe) to the NYSIIS database; and

4. Cease and desist from all contact with Plaintiffs' patients and employees outside of formal legal process directed through Plaintiffs' counsel.

Dated: December 2, 2025                                    Respectfully submitted,

                                                          **Davenport Law PLLC**

                                                          */s/ Chad A. Davenport*

                                                          Chad A. Davenport, Esq.
                                                          *Attorney for Plaintiffs*
                                                          Davenport Law PLLC
                                                          6384 Deanna Drive
                                                          Hamburg, NY 14075
                                                          (716) 217-0328
                                                          cdavenport@davenport.law